NelsoN, J.,
delivered the opinion of tbe Court.
This suit was brought before a Justice, by the defendant in error, against William Rollings, John Lyle, and Wiley Jones, who were required, in the warrant, to answer Joshua Cate, “in a plea of debt due by note, the note wrongfully in the possession of the said William Rollings, for five hundred dollars.” Judgment was rendered in favor of the defendants, by the Justice, and Cate appealed to the Circuit Court, where the suit seems to have been prosecuted against Rollings alone, and verdict and judgment were rendered against him for two hundred and ninety-six dollars and sixty- *99 six cents and costs, from which, having failed to obtain a new trial, he prosecutes this appeal in the nature of a writ of error. It seems from the proof, that Cate held a note on Rollings, who sometime in the year 1863 applied to Gass, to go with him to Cate, to see the note paid, stating that he had Confederate money, which he desired to use in the payment of his debts; that he had to take it, and would be ruined if he could not get to pay his debts with it. Gass, fearing that Cate would “get mad,” refused to go, but told Rollings to meet him at Cate’s mill on a certain day; that they met there at the time appointed, but Cate being absent, went to his house, and finally found him in the road; that Rollings told Cate he had come to pay that note; that Cate said he had to go by his son’s house; that Gass and Rollings waited in the road until his return, and that the three then went to Cate’s house; when Cate said, “you have come to pay that note,” and went into another room and got it; that Gass counted the interest and Rollings paid the note in Confederate money; that Cate handed the note over to Rollings, took the money, and, as he went to put it away, inquired whether they knew of any one who wanted to borrow the money, saying he had no use for it, and that the answer was they did not. Cate then took the money, went into another room, and put it away, saying, when he returned, that he would keep an account of men who paid him their debts in that kind of money. Gass and Rollings were unarmed at the time of these transactions, and used no force, threat or violent language, to compel Cate to take the money, but it was in proof that Gass *100 sympathized with the rebellion; that Cate was a Union man; that two of his son's were arrested by the rebels in the latter part of 1861, and released early in 1862; and that, when the note was paid, “ there was a general state of fear among Union men in regard to disobeying the rebel rule, or refusing to take their money, and many Union men had been arrested.” The defendant objected to the admission of the testimony last quoted, ■but his objection was overruled, and it was allowed to go to the jury, and to this action of the Court he excepted. It was proved that shortly before the note was paid by Rollings, one Elder paid Confederate money to him, and that Rollings said he was willing to take it, as he could use it as well, or better, than any other money in the payment of his debts. Elder, as a witness, stated that Confederate money was not received in payment of debts, as other money; and another witness testified that, after the money was paid by Rollings, he, the witness, borrowed some Confederate money from Cate, or one of his sons. This is the substance of the evidence as set out in the bill of exceptions.
Upon the question of duress, his Honor, the Circuit Judge, charged the jury as follows:
“The plaintiff alleges that he was forced against his will, to take Confederate money, through fear of personal violence. The rule of law is, that if, through present exciting fear, a person was forced to take in payment of a debt, Confederate money, such payment would not be binding upon him, and the debt would remain unsatisfied, and he would be entitled to recover the same, with •interest; but if he received Confederate money Avithout *101 objection, or without force, or present fear of danger, such reception would he a valid payment, and the courts of the country would not distuib such executed contracts. Then look to the proof, and see if the ■ plaintiff, under an exciting state of fear, took the Confederate money contrary to his will; if so, he would be entitled to a verdict; if not, the defendant would be entitled to a verdict.”
Assuming that the evidence objected to., was properly admitted, and that the instructions of the Court were perfectly correct, it is difficult to perceive on what ground the jury based their verdict; .for, although a general fear may have existed among Union men, as to the hazard of refusing to receive Confederate money, it does not appear that the defendant in error was one of the persons thus actually afraid. So far from it, he seems to have acted with much coolness and deliberation; for after he was informed, in the road, that Rollings desired to pay the note, he went to his son’s house; returned to the place where Gass and Rollings were waiting; went with them to his own house; deliberately passed into another room to obtain the note; brought it out, and received the money without the slightest objection; and, so far from exhibiting any trepidation or alarm, coolly walked into another room and returned, and then fearlessly stated that he would keep an account of men who paid him their debts in that kind of money. No threats were used; no arms were present; and the defendant carefully inquired whether any one desired to borrow the money he had received, and actually *102 loaned Confederate money, afterwards, to one of the witnesses. It is well known that the Confederate Government used every means to keep its Treasury notes in circulation, to enable it to prosecute the war, and that some of its military commanders announced, in general orders, that it would be a grave political offense not to receive it; but these orders embraced all the citizens without distinction; and we cannot perceive, as a legal question, how the fear of offending the government, which may have been common to all the citizens, can be imputed as duress, in private transactions, Avhere no threats or force were employed.
To hold that every citizen who passed, or received Confederate Treasury notes, under some general or indefinite apprehension that his failure to recognize the currency, would give offense to the Government, or any of its officers, acted under duress, and that his action can now be repudiated and disowned, would open the flood-gates of litigation, and unsettle all dealings and transactions in this State, in which that currency was employed. It would disturb the repose of society, shake the' titles to property, and produce evil results, immeasurable and incalculable. Nothing short of duress, in its legal sense, can invalidate executed contracts. Under the law, as it formerly existed, it was necessary in order to constitute duress, that there should be some threatening of life or member, or of imprisonment, or beating of the party acting, .or his wife, with a view to procure the execution of the deed, or other instrument, and the danger, existing or threatend, was re *103 quired to be personal, and danger' to goods or property, was not sufficient to avoid the deed. Shep. Touch., 28 Law Lib., 61, m.; 1 Black Com., 131, m.; 4 lb., 30, m. . Under the law, as more recently declared, duress of the property, as well as of the person, is held to be sufficient. Waller v. Parker, 5 Cold., 476. Story on Contr., 4 Ed., § 398. It was formerly held that, if the duress was by a stranger, and the obligor was not a party thereto, the agreement could not be avoided. Ibid., § 400.
But we are not aware of any case in which it has been held, that, if a party act under “a present exciting fear,” or an “ exciting fear,” without showing whether the fear was of danger to life, limb or property, the act can be legally avoided; and we hold that his Honor’s instructions were erroneous, in not defining more accurately the nature of the fear. These instructions are the more objectionable when taken in connection with the fact that evidence admitted as to the “general state of fear, existing among Union men in regard to disobeying the rebel rule, or refusing to take their money.” This was a species of hearsay testimony, not recognized by the rules of the law, and could have no legitimate application to the simple payment of a note by the plaintiff in error, to the defendant, without threats or coercion of any kind. Considered in the light of his Honor’s charge, the jury might well infer, that, because Union men generally disliked Confederate money, such dislike and duress were convertible terms. The unreported case of Mo- *104 Sween v. Miller,* does not, in our • view, sustain Ms Honor’s charge, or his action in receiving illegal testimony.
Reverse the judgment and remand the cause.

 The opinion referred to is as follows:
Supreme Court, Knoxville, September Term, 1867.
William McSween, in error, v. C. M. Milleb.
Hawkins, J., delivered the opinion of the Court.
There is no evidence to sustain the verdict; and as applicable to the facts of this case, the charge of the Court was erroneous, and tended to mislead the jury. The ruléis, where a threat of unlawful mischief or injury to the person, property or good name of a party, is of sufficient importance to destroy his free agency, the law, because of such duress, will not enforce any contract which he may be induced by such threats to make. The controlling question is, was the threat of such a character, as, under the circumstance surrounding the parties at the time, was sufficient to overcome the mind and will, or in other words, to destroy the free agency of a person of ordinary firmness ; and His free agency being thus destroyed, was he thereby induced to give h>s assent to the contract? If so, the contract can have no validity whatever, because it is wanting in the essential elements of a valid binding contract, to-wit: the free and voluntary assent of the minds of the parties making it.
Judgment reversed, and cause remanded for a new trial.